FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 AUG -1 PM 2: 06

U.S. DISTRICT COURT
N.D. OF ALABAMA

HAMPTON/GHI ASSOCIATES NO. }
1, a California general partnership, }
 }
    Plaintiff, }
 }
 }  CASE NO. CV 97-B-1564-S
v. }
 }
ANN SANDERS; ORMOND }
SOMERVILLE; THE BYRD }
COMPANIES, INC., }

    Defendants.

ENTERED

AUG 01 1997

## MEMORANDUM OPINION

    Currently before the court is the application of plaintiff Hampton/GHI Associates No. 1 ("plaintiff") for a preliminary injunction. Upon consideration of the evidence, the argument of counsel, and the relevant law, the court is of the opinion that plaintiff's application is due to be denied.

### FACTUAL SUMMARY

    The facts relevant to this controversy are as follows. On or about September 16, 1986, Hampton Inns, Inc, as Tenant, entered into a Ground Lease Agreement ("the Lease"), with Fitts J. Smitherman, Rosemary Smitherman, The Byrd Companies, Inc. ("The Byrd Companies"), Ormond Somerville, and Martha Somerville, collectively as "Landlord." (Am. Compl. at ¶ 5). The Lease related to a tract of land situated on U.S. Highway 280 in Jefferson County, Alabama, on which a Hampton Inn was subsequently erected. (*Id.*) The Lease provided for an initial term of twenty (20) years and subsequent renewal periods. (*Id.*) In relevant part, paragraph 11.1 of the Lease provides as follows: "Tenant may not assign or

sublet the premises or any portion thereof without the consent of Landlord first obtained, which consent Landlord shall not unreasonably withhold. Upon approval of any such assignment, Tenant shall be released of any liability under this Lease." (Ex. A to Original Compl. at ¶ 11.1).

On or about December 21, 1987, Hampton Inns, Inc. assigned the Lease to plaintiff. (Am. Compl. at ¶ 8). Defendants expressly consented to the assignment and executed a ground lessor's estoppel certificate.[1] (*Id.* at ¶ 9).

On or about April 2, 1997, Bill Post ("Post"), attorney for plaintiff, allegedly notified defendants, through The Byrd Companies, of plaintiff's decision to enter into a purchase agreement with Equity Inns Partnership, L.P. ("Equity Inns"), and to sell the hotel located on the property that is subject to the Lease. (*Id.* at ¶ 10). Additionally, Mr. Post requested that defendants consent to the assignment of the Lease by executing a Ground Lease Landlord Estoppel Certificate, which was forwarded to defendants by Mr. Post. (*Id.*) In conjunction with that request, Mr. Post forwarded to defendants an executive summary of Equity Inns, Inc. (*Id.*)

In its amended complaint, plaintiff alleges that during April, May, and June, 1997, it made unsuccessful efforts to obtain an executed estoppel certificate from defendants. (*Id.* at ¶ 11). On or about June 11, 1997, Matthew A. Nyman ("Nyman"), attorney for Equity Inns, wrote a letter to Wood Byrd, of defendant The Byrd Companies, reiterating the request for an

---

[1] Rosemary Smitherman and Fitts J. Smitherman were originally named as defendants in this action, but on or about December 27, 1996, Rosemary Smitherman, as executrix of the Estate of Fitts J. Smitherman, conveyed the Smithermans' interest in the property to defendant Ann S. Sanders. (Am. Compl. at ¶ 9).

2

executed estoppel certificate. (Ex. G to Original Compl.) On or about June 13, 1997, the Chief Financial Officer of The Byrd Companies, Michael L. Gravois ("Gravois"), wrote a letter to Messrs. Post, Nyman, and Gerald Best ("Best"), attorney for Equity Inns, acknowledging that Wood Byrd had asked him to review the estoppel certificate. (Ex. H to Original Compl.) In that letter, Mr Gravois sought information on the financial strength and management capabilities of Equity Inns. (*Id.*)

On or about June 13, 1997, Ron Cooper of Equity Inns, faxed Mr. Gravois audited financial statements for Equity Inns and Interstate Hotels Company, the parent company of Crossroads Future Company, L.L.C., the proposed lessee of Equity Inns. (Am. Compl. at ¶ 13).

In a June 18, 1997 fax from Gravois to Messrs. Best, Nyman, and Post, Gravois acknowledged receipt of the financial statements, offered some suggested revisions to the proposed estoppel certificate, and stated that he would contact them if he needed additional information. (Ex. J to Original Compl.) Later on June 18, 1997, Nyman faxed a letter and revised estoppel certificate to Gravois in which he allegedly incorporated all of the comments of Gravois up to that point. (Ex. K to Original Compl.)

On June 19, 1997, Gravois sent Messrs. Best, Nyman, and Post a fax thanking them for sending the revised estoppel certificate, and suggesting additional changes to that document. (Ex. L to Original Compl.) Gravois also stated that Wood Byrd had a "call in to the other landlords to make sure they are satisfied with the estoppel." (*Id.*) Later on June 19, 1997, Gravois sent another fax to Best, Nyman, and Post, informing them that he did not have

an answer, but that he would contact them the next morning as soon as heard from Wood Byrd. (Ex. M to Original Compl.)

On June 23, 1997, Post faxed a letter to Gravois in which he, inter alia, renewed his request for the delivery of an executed estoppel certificate, and informed Gravois that, because a June 24, 1997 closing had been scheduled for the transfer of properties, including the hotel located on the property which is the subject of the Lease, his client would suffer substantial damages if the certificate were not delivered. (Ex. N to Original Compl., Pl.'s Application for Prelim. Inj. at ¶ 7). Defendants never consented to the assignment of the Lease through the execution of an estoppel certificate or otherwise. (Pl.'s Am. Compl. at ¶ 20).

Thereafter, plaintiff filed a complaint in this court, alleging that defendants breached the contract between the parties by unreasonably withholding their consent to the assignment of the premises subject to the Lease, which precluded the June 24, 1997 closing on that property. (Pl.'s Am. Compl. at ¶¶ 23, 24).

On June 30, 1997, and after extending the closing deadline with Equity Inns from June 24, 1997 until July 21, 1997, plaintiff filed the application for a preliminary injunction presently before the court. (Pl.'s Application for Prelim. Inj. at ¶ 7). Defendants responded to plaintiff's application on July 11, 1997. The court conducted a hearing on plaintiff's application on July 16, 1997.

## DISCUSSION

"The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it." *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (citation omitted). "The chief function

4

of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Northeastern Florida Chapter of the Ass'n of General Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir. 1990) (citation omitted). Before a preliminary injunction will issue, the court must find that the movant has established the following four elements:

> (1) a substantial likelihood of success on the merits;
>
> (2) a substantial threat of irreparable injury if the injunction were not granted;
>
> (3) that the threatened injury to the movant outweighs the harm an injunction may cause the nonmovant; and
>
> (4) that granting the injunction would not disserve the public interest.

*Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir. 1992) (citations omitted). In the present case, because the court is of the opinion that plaintiff failed to satisfy its burden with respect to the second element of the four part test, the court need not discuss elements one, three, and four. *Nnadi*, 976 F.2d at 690.

As for the second element, "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered . . . ." CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 at 139 (2nd ed. 1995). Plaintiff contends that "[t]he Eleventh Circuit defines 'irreparable injury' as a 'real and immediate -- as opposed to a merely conjectural or hypothetical -- threat of *future* injury.'" (Pl.'s Memorandum in Support of its Application for

5

Prelim. Inj. at 9 (citing *Church v. City of Huntsville*, 30 F.2d 1332, 1337 (11th Cir. 1994)). While plaintiff is partially correct in that "[t]he injury must be 'neither remote nor speculative, but actual and imminent,'" *City of Jacksonville, Fla.* 896 F.2d 1285 (citation omitted), this statement alone is insufficient to describe what the law requires plaintiff to prove in order to establish irreparable injury. As the Eleventh Circuit has stated:

> An injury is 'irreparable' only if it cannot be undone through monetary remedies. 'The key word in this consideration is *irreparable*. Mere injuries, however substantial in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'

*City of Jacksonville, Fla.*, 896 F.2d at 1285 (citation omitted).

In its memorandum in support of its application, plaintiff argues that if the Landlord is permitted to continue to withold consent to the assignment, it would irretrievably lose the present opportunity to sell the property, incur additional expenses because of the inability to close the deal with Equity, and be left with no assurance, and great doubt, that it will ever be able to sell the property. (Pl.'s Memorandum in Support of its Application for Prelim. Inj. at 9). Furthermore, in a two page letter brief submitted subsequent to the hearing on this matter, plaintiff argues that "the harm it would suffer, should Defendants continue to unreasonably withhold their consent to the assignment, is irreparable and cannot be fully compensated by money damages." In support of this position, plaintiff offers the case of *Starlight Sugar, Inc. v. Soto*, 114 F.3d 330 (1st Cir. 1997).

In *Starlight Sugar*, the Department of Agriculture of the Commonwealth of Puerto Rico attempted to enforce a regulation that prohibited the importation into Puerto Rico of refined sugar intended for consumer sale that was not prepackaged in units of five pounds or less. *Id*. at 331. The plaintiffs, a group of sugar importers, brought suit alleging that the regulation violated both the dormant Commerce Clause and the Equal Protection Clause. In affirming the district court's decision that the plaintiff sugar importers had met all of the grounds for preliminary injunctive relief, the court stated: "The concern in the present situation is clear: although we remain in the domain of economic profit or loss, a context in which compensation through legal remedies is preferred, as a practical matter the potential value of an evanescent business opportunity may be extremely difficult to measure, after the fact." *Id*. at 332.

In the present case, even if the court assumes that plaintiff will irretrievably lose the present opportunity to sell the property, incur additional expenses because of the inability to close the deal with Equity, and be left with no assurance that it will ever be able to sell the property, plaintiff has failed to demonstrate the inadequacy of compensatory or other corrective relief for addressing these alleged injuries. Without such a demonstration, this court is unable to find the irreparable injury that is a prerequisite to the issuance of a preliminary injunction. Indeed, at the hearing on this matter, plaintiff's representative, Mr. Chris Daniels, conceded during cross examination that plaintiff could calculate in exact numbers the monetary loss or cost due to the failure to sell the property to Equity Inns. This testimony, as well as the well-established rule that "a preliminary injunction is a 'drastic' remedy . . . , *Crochet v. Housing Auth. of Tampa*, 37 F.3d 607, 610 (11th Cir. 1994) (citation omitted), convinces the court that plaintiff has failed to sustain its burden of demonstrating irreparable harm.

7

## CONCLUSION

Based upon the foregoing, the court concludes that plaintiff's application for a preliminary injunction is due to be denied. An Order denying plaintiff's application will be entered contemporaneously herewith.

**DONE** this 1st day of August, 1997.

_____
SHARON LOVELACE BLACKBURN
United States District Judge